Case number five today is United States v. Dameron. Ms. Rameh. Good morning, Your Honors. May it please the Court, Counsel. My name is Colleen Rameh and I am here on behalf of Emanuel Dameron today. In this case, the District Court ruled that an officer's belief that an individual was carrying a firearm, or a concealed firearm, was enough to stop and frisk him because he was in a high-crime neighborhood. Under this Court's precedent, this is not enough to establish reasonable suspicion. Moreover, the government's proffered alternative bases for finding reasonable suspicion are unavailing. Therefore, we ask this Court to reverse the District Court's ruling on Mr. Dameron's motion to suppress evidence. In Watson, this Court held fairly clearly that the presence of a concealed firearm in public does not create reasonable suspicion of an ongoing crime because Illinois does permit concealed carrying with a license. Watson also held that people who live in rough neighborhoods who want, and in many situations, may carry guns for protection. They should not be subject to more intrusive police practices than are those from wealthy neighborhoods. That's fairly clear evidence or a fairly clear authority for our contention that the District Court erred in holding that this was enough to establish... What about the fact that he had gotten off a bus and was apparently waiting to board another? Your Honor, I don't know if he had gotten off a bus, but he did board a bus. Yes, that is correct. And Illinois doesn't allow concealed carry on buses. At least it didn't at the time of these events. The government did proffer a city ordinance in its response brief, and the plain language of the ordinance, at least as I was able to discern, does not actually prohibit concealed carry permit holders from boarding buses. The government then attempted belatedly to proffer another Illinois Code section, Illinois state law, that seems to suggest that it's not permissible to have a gun on any public transportation in any place in Illinois. That is what it says. That, sure, but they, I mean, first of all, I would argue that this is waived. The government proffered it in a 2018 letter. How is it waived? They did not... The government made this argument. They may not have initially cited the best statute, but now they've cited the best statute. Okay, and the statute, I think when we look at Bruin, the language in Bruin, the statute is quite possibly unconstitutional. I mean, it's so broad that it takes, like, the spaces, the, you know, sorry. It takes this language. I don't see how one could read Bruin back retroactively into a state statute in 2018, especially not when I didn't even see an argument about the unconstitutionality of state law. Well, because it was only proffered in a 2018 letter, and I had 350 words to respond. So I did try to mention that, but this was the first time it was even brought up by the government. See, one of the difficulties is in the district court, there wasn't a big discussion about the fact that Mr. Dameron got on the bus, right? There was a whole tangle about what the video shows. Well, the video shows him on the bus. That's where he was stopped. No, no, no, I know, but you didn't represent him in the district court, right? Correct. Okay, and so on appeal, what you're doing is you're putting your finger on a hard issue, and that's the intersection of Bruin and current Second Amendment jurisprudence and Terry, okay? But the fourth amendment violation, if there was one, doesn't happen as a result of the police watching the video. It happens when they stop him, correct? Yes, Your Honor. Right, and so the stop occurs when he's on a CTA bus. Right. And that's why I think Judge Easterbrook is at. That's the only time the fourth amendment violation could have happened. And the officers never mentioned that they believed he was violating the law. The motion very clearly said that, you know, alleged that there was no evidence that he was violating any law. That was the premise of the motion, and the government never argued in the district court, yeah, we thought he had a gun, and oh, by the way, he got on a bus, which is against the law. There was no discussion of that. They had every opportunity to raise that. The district court didn't rely on it. The government didn't rely on it. And it doesn't seem that the officers relied on it. No officer testified, oh, we saw him get on the bus, and then we decided that we needed to stop him because that was against the law. Yeah, but I have a feeling that your adversaries are going to come up and say, yeah, but it's a two-way street here. So nor did Mr. Damron make the argument that Ms. Ramay is now articulating in the courtroom. Sure. Right. I mean, I would argue he did. It was not quite as fleshed out as I have made it. However, it was preserved under Ye Be City of Escondido. It was sufficiently preserved. They had an opportunity to respond to it. There was no argument in the district court that there was a law violation. And then on appeal, the argument was that it violated a city ordinance, which I don't think holds up when you read the text of the ordinance. So then, once we're there, if they had raised this law violation, there may have been an opportunity to discuss whether or not he was really violating a constitutional law. Or, you know, because there's no good faith exception, because it doesn't appear that anyone actually relied on it. The officers believed that they could stop him because he was carrying a firearm. They believed he was carrying a firearm in a bad neighborhood. And that was it. Yeah, but, I mean, you know this area of law very well. Their subjective belief doesn't matter. Correct. But that would be where good faith might come in if there is a problem. No, the Supreme Court held in Devenpeck against Alford that the arresting officer doesn't even need to know the basis for the arrest. Right. That it can be articulated later, years later. Okay. The only question was whether there was one. So, and my argument then is that the law, looking at it now, with what we know, is overly broad. It's overly broad. This new citation to this new Illinois, or this law that the government has now proffered in its 28J letter, that law is overbroad. Yeah, this particular appeal does not seem to be the best vehicle, though, for adjudicating the constitutionality of a municipal statute. No, absolutely not. And certainly not when it's raised belatedly without an ability to adequately brief the issue. I would agree with that, Your Honor. So I would ask the court to disregard that and rule on the basis of the district court's ruling and overturn its ruling that possession of a firearm in a bad neighborhood is enough to stop an individual under Terry. Thank you. Thank you, counsel. Ms. Partham. May it please the court, Michelle Partham for the United States. The district court did not plainly err in holding that officers had reasonable suspicion to stop and frisk the defendant. In fact, the district court's judgment was not in error at all because the totality of the circumstances more than supports the conclusion that there was reasonable suspicion in this case. First, the defendant does not challenge the district court's finding that officers had reasonable suspicion to believe the defendant had a firearm. Second, the defendant does not dispute that he boarded a bus carrying what officers reasonably suspected was a firearm. Those two factors alone provide reasonable suspicion for the stop. Nothing more is needed. But there's more here. The defendant also does not challenge the district court's findings about the extremely high crime rate of the particular block on which he was observed for 10 minutes on pod camera before he was stopped on the bus. That block was the site of a dispute between rival factions of the Black Disciple and Gangster Disciple street gangs where there had been multiple shootings and killings every year. One of the officers who testified at the suppression hearing testified that he had responded to that block more than 100 times in his 8-year career for shootings, killings, and drug activity. And the other officer who testified testified that he had been monitoring that block daily for 18 months. And finally, fourth and finally, the defendant's behavior supports the reasonable suspicion. He was loitering on that uniquely crime-plagued block for 10 minutes as the officer observed on pod camera, looking around anxiously, and that behavior supports reasonable suspicion. I don't know. He could have been waiting on the bus. Your Honor, he may have— Got off one—I mean, it seems to me he may have been waiting on the bus. I mean, you can call that loitering. But, I mean, the spin that you're trying to put on it is he's kind of looking over his shoulder. He's a drug dealer. He's got drugs in his pocket. He may have cash. He's got the gun there to protect it all. You know, that's kind of what's between the lines of your argument. But I think in looking at the video and what happened, he may have just been waiting on the bus. He may have been. Under this court's precedence, including Richmond, reasonable suspicion does not need to exclude innocent explanations for the conduct. Innocent behavior can contribute to reasonable suspicion, and it did in this case. The defendant's conduct is certainly not the most significant component of the reasonable suspicion analysis. Probably the most significant components are the fact that he was carrying what he does not dispute officers reasonably suspected was a firearm, and then he boarded a bus. But there are other factors in the record as well that support that conclusion. And as the government has raised here before this court, the law in this state outlaws carrying a firearm aboard public transit, which is what he did here. There may even have been probable cause based on this record, which is far more than what's needed for reasonable suspicion. And when you say that, you have in mind the specific provision in the Concealed Carry Act, correct? Not the more general provision in 720 about entering a vehicle. What I'm referring to is the city ordinance prohibiting someone from boarding a CTA bus with a firearm, and the more general ordinance that prohibits carrying a firearm aboard a vehicle. Those are more apt because he is not actually a CCL licensee. They didn't know that at the time, whether he was or wasn't. But any one of those three are sources of authority that show that boarding that bus with a firearm was unlawful. And there was more than enough evidence for an objectively reasonable suspicion that he had done so in violation of the law. If there are no further questions, in sum, the totality of the circumstances here supports the District Court's conclusion that there was reasonable suspicion to stop and frisk the defendant, and the judgment of the District Court should be affirmed. Thank you. Thank you, Counsel. Anything further, Ms. Romay? Thank you, Your Honors. I'd just like to note that the opposing counsel mentioned that the totality of the circumstances supported a finding of reasonable suspicion, aside from our conversation earlier about the constitutionality of the legal provisions. And in this case, if you've watched the video, the officers didn't testify that there was anything specifically about his behavior that would clue them in that he was behaving suspiciously in the context, nor, just from a layperson's view of the video, was there anything inherently suspicious about Mr. Dameron's behavior. As Your Honor mentioned, very plainly was killing time before boarding the bus. I would urge the Court not to wade into this sensitive places discussion on this, but I think that it is a consideration, if we're going to be looking at whether there's reasonable suspicion, relying on a very potentially unconstitutional statute might not be the best basis to find reasonable suspicion. Are there no further questions? Thank you. Thank you, Counsel.